# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

VERTRUE INCORPORATED,      :
     Plaintiff,           :
                             :
v.                           :       Civil No. 3:05cv1809 (PCD)
                             :
ALEXANDER B. MESHKIN,     :
     Defendant.           :

## RULING ON MOTION TO DISMISS

Defendant moves, pursuant to Rules 12(b)(2), 12(b)(6) and 19 of the Federal Rules of

Civil Procedure, to dismiss Plaintiff's Complaint in its entirety or to stay the action in favor of

ongoing arbitration.  Hearing on the motion was held March 13, 2006.  For the reasons stated

herein, Defendant's Motion to Dismiss or Stay [Doc. Nos. 39, 43] is **denied**.

## I.     BACKGROUND[1]

Plaintiff initiated the instant action by filing a complaint in the Superior Court of

Connecticut on October 25, 2005.  On November 28, 2005, Defendant removed the action to this

Court pursuant to 28 U.S.C. §§ 1332 and 1441(b).  The instant Motion to Dismiss was filed in

this Court on February 27, 2006.

Plaintiff is the successor in interest to MemberWorks Incorporated, a corporation

organized and existing under the laws of the State of Delaware, with its principal place of

business in Stamford, Connecticut.  Compl. ¶ 2.  Defendant is an individual residing in North

---

[1]    A court considering a motion to dismiss for failure to state a claim must accept the facts alleged in the complaint as true.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232 236 (1974).  Accordingly, many of the facts presented here are taken from the Plaintiff's Complaint.  A more comprehensive background is necessary, however, for resolution of the issues of personal jurisdiction and failure to join an indispensable party and Defendant's Motion to Stay.

Carolina.[2]  Id. ¶ 3; Def's Mem. at 3.  According to Plaintiff, Defendant is the Chief Executive

Officer, principal owner, principal shareholder and director of Nutzz.com, LLC ("Nutzz") and its

parent company, Bang Racing, LLC ("Bang Racing"), both Delaware limited liability companies

with their principal place of business in Mooresville, North Carolina (hereinafter referred to

collectively as the "Companies").  Compl. ¶ 3.  Plaintiff also alleges that Defendant entirely

controls Nutzz and that Nutzz serves as his "alter ego."  Id.; see also Pl's Opp. at 5-6 (asserting

that Defendant admits, in his Declaration, that he is the President and manager of Nutzz, a

limited liability company with only one member, Bang Racing).

Plaintiff generally alleges that Defendant, acting as the "alter ego" of the Companies,

"engaged in a scheme to defraud [Plaintiff] by misrepresenting and concealing Nutzz.com's and

Bang Racing's marketing capabilities (or lack thereof) and Meshkin's, Nutzz.com's and Bang

Racing's dire financial status in order to induce [Plaintiff] to enter into an agreement with

Nutzz.com and provide it with an advance of $1.25 million to fund its advertising and

promotional obligations under that agreement."  Compl. ¶ 1.  Plaintiff contends that Defendant

"intentionally misrepresented his personal background and his two companies' ability to perform

such obligations when, in fact, neither company would be able [to] do so."  Id.  Plaintiff asserts

that Defendant made false representations designed to conceal his companies' "dire" financial

condition in an effort to induce Plaintiff to enter into an agreement with Nutzz.  Id.  Plaintiff

maintains that had it known the truth about Defendant's and the Companies' financial conditions

and their inability to carry on operations, it would never have entered into the agreement with

---

[2]         At the hearing, defense counsel confirmed that Defendant's address is 8545 Townley Road, Apartment 2K, Huntersville, North Carolina 28078, the address listed on the Complaint.

2

Nutzz, advanced Nutzz $1.25 million, accepted Bang Racing as Nutzz's guarantor or expended significant additional sums of money in the good faith, albeit erroneous, belief that the Agreement would be performed.  Id.

Defendant explains that the genesis of the "Nutzz entity" came about as a result of Defendant's desire to create a membership club for NASCAR® racing fans.  See Def's Mem. at 4.  Defendant contemplated establishing two levels of membership: (1) a free, general membership open to "anyone" and (2) an "elite" membership granting certain benefits and for which an annual fee would be charged.  See id.  In early 2004, Defendant created the Nuttz.com website in an effort to attract NASCAR® racing fans and to encourage them to become members of the general membership program.  See id.  Defendant, looking for a company to promote and market its elite membership program, came to the conclusion that Plaintiff would be the "ideal corporate partner."  Id. at 5.

Defendant first spoke with Carl Peru, Vice-President of Product and Partner Marketing at Vertrue, to discuss his idea of a NASCAR®-affiliated membership club.  See Def's Mem. at 3-4.  Following that initial contact, Defendant presented his ideas to and discussed creating and marketing the elite membership program with other Vertrue representatives.  See id.  Plaintiff supplements its jurisdictional allegations with the Declaration of Doug Weiss ("Weiss Declaration"), which states that Defendant "met with representatives of Vertrue, including Doug Weiss, in Stamford, Connecticut" and made various representations.  Pl's Opp. at 4-5 (citing Weiss Decl. ¶¶ 5, 6, 9 and Compl. ¶ 7).  Weiss asserts that Defendant first met with Vertrue representatives at Vertrue's Connecticut office on May 20, 2004.  Weiss Decl. ¶ 6.  Weiss claims that the meeting "lasted more than one hour," during which Defendant "represented that he was

the Chief Executive Officer of Bang! Racing, LLC" and the "Chief Executive Officer, principal owner, principal shareholder and director of Nutzz.com, LLC." Id. ¶¶ 7-8.  According to Weiss, Defendant also represented that "he was a successful entrepreneur who built an Internet-based company known as Surfbuzz.com and sold it to another Internet-based company called MyPoints for millions of dollars" and that "Bang Racing and/or Nutzz.com had an agreement with Larry McReynolds, a well-known figure in NASCAR® and Fox Television Announcer, which agreement Meshkin represented would provide credibility and additional revenue opportunities for the membership programs." Id. ¶¶ 9-10; see also Def's Powerpoint Presentation, attached as Pl's Exh. 2.  Plaintiff alleges that Defendant failed to disclose at that meeting that McReynolds was no longer affiliated with Defendant's Companies.  Compl. ¶¶ 6, 7.  Weiss also claims that Defendant provided detailed proposals regarding the parameters and operations of the proposed membership programs, "represented that Nutzz.com had a significant Network Operations Center in Herndon, Virginia, as well as two off-shore software development centers capable of providing significant Internet development and marketing services" and "made detailed representations about Nutzz.com's ability to market the proposed programs via eBay," specifically "representing that Nutzz.com could deliver one billion (1,000,000,000) eBay advertising impressions by the end of 2004."  Weiss Decl. ¶¶ 12-14.

Following the May 20, 2004 meeting, Weiss asserts that Defendant continued to communicate with Plaintiff about the parameters of the proposal "on a regular basis" via telephone calls, mail, email and facsimile transmissions.  Id. ¶ 15.  Plaintiff alleges that as a result of the mispresentations made by Meshkin in Connecticut and the communications that followed, the parties entered into an agreement on July 16, 2004 to develop the Nutzz Elite

4

membership program (the "Agreement").  Def's Mem. at 5; Compl. ¶ 9; Weiss Decl. ¶ 16.  The Agreement contemplated that the parties, working together, "would support and promote a fee-generating membership program that allowed members to obtain benefits provided by both [Nutzz and Plaintiff]."  Compl. ¶¶ 9, 10.  Bang Racing guaranteed performance of Nutzz's obligations under the Agreement.  Id. ¶ 12.  Plaintiff paid Nutzz an advance of $1.25 million (the "Advance") in an effort to fund advertising and promotional activities; an amount that Nutzz agreed to pay back from the money it earned under the Agreement.  Id.

After the parties formally entered into the Agreement, Weiss asserts that Defendant "participated in regular weekly telephone conferences in Vertrue's Stamford, Connecticut headquarters to discuss the Agreement."  Weiss Decl. ¶ 17.  Moreover, Weiss represents that Defendant again traveled to Connecticut and met with Vertrue representatives at Vertrue's Stamford, Connecticut office in or about November of 2004, in order to "discuss the parties' continuing relationship, and the status of the parties' fulfillment of their obligations under the Agreement."  Id. ¶ 18.  Plaintiff contends that Defendant's communications by telephone and mail directed to Plaintiff in Connecticut contained "material misrepresentations and failures to disclose regarding the Companies' financial condition and business relationships after entering into the Agreement."  Def's Mem. at 5 (citing Compl. ¶ 26).

Defendant asserts that he, on behalf of Nutzz, made only two one-day visits to Plaintiff's Connecticut offices on or about April or May 2004 and May 20, 2004, both prior to signing any agreement reflecting a "definitive business relationship" between Plaintiff and Defendant's companies.  See Def's Mem. at 3 (citing Meshkin Decl. ¶ 12).  Defendant emphasizes that the rest of the parties' negotiations took place via telephone conversations which Defendant neither

placed nor received in Connecticut and via written correspondence mailed or received from offices in North Carolina and from a speedway in St. Louis, Missouri.  Id. at 3-4 (citing Meshkin Decl. ¶ 14).

Plaintiff asserts that the Companies "failed in numerous ways to perform their contractual obligations under the Agreement," listing nine specific ways that Defendant is alleged to have failed to perform.  See Compl. ¶ 16(a)-(i).[3]  Plaintiff alleges that it repeatedly demanded that Nutzz and Bang Racing perform their obligations and that Defendant send Plaintiff the "Trackside Marketing Plan" it was entitled to receive under the Agreement.  Id. ¶ 17.  Plaintiff maintains, however, that Defendant never sent the Trackside Marketing Plan and that Nutzz and Bang Racing never complied with their contractual obligations.  Id.  Plaintiff also alleges that ultimately, Defendant refused to attend a meeting with Plaintiff's representatives and, "for all intents and purposes, disappeared, leaving [Plaintiff] with no means to contact him."  Id.

---

[3]     Plaintiff alleges that the Companies' failures to perform their contractual obligations included, *inter alia*: (a) having ongoing problems, which were not resolved, with "designing a properly functioning Nutzz Elite link from the general Nutzz.com membership page" which "prevented Nutzz.com general members from becoming paying Nutzz Elite members;" (b) the one billion eBay impressions that ran in 2004 were "related to the Nutzz standard, free program only" rather than being the Vertrue pre-approved banners relating to the Nutzz Elite program; (c) failing to get an "online auction up and running until well beyond the October 4, 2004 deadline," which auction constituted the "only redemption channel for a member's earned online 'currency'"; even when it was up and running, the Companies failed to "complete the work necessary to tie the Nutzz.com 'points system' for the auction to the members' activity in the Nutzz Elite benefits provided by Vertrue;" (d) "fail[ing] to produce the 100 million email solicitations for the Nutzz Elite program within the time required under the Agreement; (e) "fail[ing] to produce a trackside marketing plan . . . for the promotion of the Nutzz Elite program;" (f) "fail[ing] to deliver NASCAR®-related benefits for the Nutzz Elite program, including online motorsports content which the Nutzz Elite program was relying on to be alighted with the agreed upon NASCAR® positioning; (g) "fail[ing] to create and maintain distribution channels, including, but not limited to, relationships with other websites, retail channels, trackside channels and television channels;" (h) "misrepresent[ing] material information concerning Nutzz.com's and Bang Racing's marketing services, sponsorship of a car racing team for a trackside marking program and relationships with eBay and Yahoo for marketing impressions;" and (i) "apparently ceas[ing] all operations [and] abandoning all performance of their obligations." Compl. ¶ 16.

Defendant, however, contends that Plaintiff began to "contemplate the creation of the FastTrack Savings program ('FastTrack')" in early February 2005.  Def's Mem. at 5.  According to Defendant, FastTrack is a program designed to target NASCAR® enthusiasts and as such, would compete directly with the Nutzz Elite program.  Id.  Defendant contends that Plaintiff began to contemplate the creation of this program even before it served Nutzz with written notice of its termination of the Agreement on or about February 10, 2005 and claims that Plaintiff's "real reason" for terminating the Agreement was to start its own NASCAR®-affiliated membership club, not because Nutzz allegedly breached the Agreement.  Id. at 6.  Defendant also asserts that Plaintiff's letter failed to comply with Section 1(b) of the parties' Agreement, which required the terminating party to "set forth the specific nature of each breach upon which such termination is based."  Agreement ¶ 1(b), attached to Compl. at Exh. A.

The Agreement between Plaintiff and the Companies, to which Defendant is not a party, contains the following arbitration provision:

> With the exception of seeking injunctive relief or other relief for violation of Section 12 above [confidential information], any dispute arising under the Agreement, including any issues related to arbitrability or the scope of this arbitration clause, will be finally settled by arbitration in accordance with the rules of the American Arbitration Association and the United States Arbitration Act.

Agreement ¶ 13, Compl. at Exh. A.  Nutzz notified Plaintiff of its intent to arbitrate certain claims under the Agreement by letter dated August 4, 2005.  As amended, the demand for arbitration asserts claims of and requests monetary relief for: (1) breach of the Agreement's exclusivity provisions; (2) breach of Plaintiff's obligations under the Agreement to promote the Nutzz Elite Program; (3) breach of the public announcement provisions of the Agreement; (4) Plaintiff's unlawful use of Nutzz's trademarks and other protected intellectual property; (5)

7

violation of the Delaware and Connecticut Unfair and Deceptive Trade Practice Acts; and (6) violation of the Uniform Trade Secret Act. <u>See</u> Def's Mem. at Exh. 1.

Plaintiff filed its answer, affirmative defenses and counterclaims on or about September 2, 2005. In that response, Plaintiff denied all material allegations set forth in Nutzz's arbitration letter and asserted four counterclaims against the Companies, including: (1) breach of contract (failure to perform); (2) breach of contract (failure to repay the $1.25 million advance); (3) fraud; and (4) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, <u>et seq</u>. ("CUTPA"). <u>See</u> Pl's Opp. at Exh. B. The arbitration is scheduled to close on July 6, 2006.

## II. DISCUSSION

Plaintiff makes several claims for relief in this action, including: (1) a claim to pierce the corporate veil and impose liability under an "alter ego" theory, alleging that because Defendant "personally dominated and controlled the operations of Nutzz and Bang Racing" and "failed to maintain or respect the independent legal identities of his companies," using them "as shields to carry out his own personal business, the Court should pierce the corporate veil and hold Defendant personally liable for repayment of the companies' debt under the Agreement, Compl. ¶¶ 41-45; (2) a claim of fraud and fraud in the inducement, alleging that Defendant "engaged in a scheme to defraud [Plaintiff] by [knowingly] misrepresenting and concealing Nutzz.com's and Bang Racing's marketing inabilities," their "lack of staff and operational support," Defendant's and his companies' "dire financial situation," and "the loss of key members of the Bang Racing team" in an effort to induce Plaintiff to enter into the Agreement and to continue investing in the program, resulting in "significant damages," <u>id</u>. ¶¶ 46-50; (3) a claim of civil theft, alleging that Defendant's misrepresentations and intentional failures to disclose material information deprived

Plaintiff of the $1.25 million advance it made to Nutzz, a company controlled by Defendant for his own benefit, for which Plaintiff claims it is entitled to recover treble damages in accordance with Conn. Gen. Stat. § 52-564, id. at ¶¶ 51-54; (4) a claim for conversion, alleging that Defendant, through his misrepresentations and failure to disclose material information, induced Plaintiff to advance Nutzz $1.25 million and has since refused to repay to Plaintiff the $1.25 million advance, id. at ¶¶ 55-58; (5) a claim for unjust enrichment, alleging that Defendant received a benefit from Plaintiff (i.e., the $1.25 million advance) and has unjustly failed to pay Plaintiff for the benefit he received, causing Plaintiff to suffer damages, id. at ¶¶ 59-63; and (6) a claim under the CUTPA, alleging that Defendant's actions, described herein, constituted an "intentional and wanton violation of [Plaintiff's] rights, unfair or deceptive acts or practices in their conduct of trade or commerce in Connecticut" and a violation of the CUTPA, id. ¶¶ 64-68. Plaintiff also claims that Defendant's actions were "immoral, oppressive, unscrupulous and violative of public policy, entitling Plaintiff to an award of punitive damages" and that it has experienced and continues to experience ongoing financial losses amounting to substantial harm. Id. ¶ 67.

### A.    Personal Jurisdiction

Plaintiff alleges that jurisdiction is proper in Connecticut because Defendant: (1) "transacted business with Vertrue in Connecticut," (2) "committed tortious acts within [] Connecticut," and/or (3) "committed tortious acts outside of Connecticut that caused injury to Vertrue within Connecticut." Compl. ¶ 3. Plaintiff also alleges that Defendant expected or reasonably should have expected his actions and/or omissions to have consequences in Connecticut. Id. In response, Defendant argues that he did not *individually* conduct business in

Connecticut, contending that the acts alleged are insufficient to confer jurisdiction and, in any event, were undertaken in his role as a fiduciary for Nutzz. Moreover, Defendant asserts that the exercise of jurisdiction over him individually would violate constitutional due process principles.

1.    Standard Applicable to a Rule 12(b)(2) Challenge

Whether Defendant, a nonresident individual, is subject to personal jurisdiction in this court is determined by the law of the state in which the district court sits—in this case, Connecticut. Fed. R. Civ. P. 4(k)(1)(A); see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002). The personal jurisdiction determination involves a two-part analysis. Bank Brussels Lambert, 305 F.3d at 124. First, the Court must determine whether Connecticut's long-arm statute reaches this particular defendant. Second, if it is found that the long-arm statute applies, the Court must determine whether the exercise of jurisdiction over this defendant violations constitutional due process principles. Id.; accord Milne v. Catuogno Court Reporting Servs., Inc., 239 F. Supp. 2d 195, 197 (D. Conn. 2002).

Plaintiff, as the party opposing the Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, bears the burden of establishing that the court has jurisdiction over Defendant. DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81 (2d Cir. 2001). On March 13, 2006, this Court heard oral arguments on the Motion to Dismiss. The parties, however, presented no witnesses and made no offers of proof with regard to the personal jurisdiction issue. Nor did they file any affidavits or counter-affidavits, which are required to assert facts not apparent on the record. Practice Book § 10-31(a). Where, as here, a court does not "conduct a full-blown evidentiary hearing on the motion," Plaintiff need only make out "a prima facie showing of jurisdiction through its own affidavits and supporting materials." Id.; Bank Brussels Lambert v. Fiddler

10

Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999) (quoting Marine Midland Bank, N.A.

v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)); Knipple v. Viking Communications, Ltd., 236

Conn. 602, 608, 674 A.2d 426 (1996) (considering "the undisputed factual allegations in the

complaint as well as the undisputed factual allegations in [plaintiff's] affidavits when

adjudicating the motion where no evidentiary hearing has been held"). Such a showing must be

made by alleging facts, not simply conclusions, but the Court "construes jurisdictional allegations

liberally and takes as true uncontroverted factual allegations." Robinson v. Overseas Military

Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (internal citations omitted).  Moreover, in

Connecticut, "[w]hen a motion to dismiss for lack of personal jurisdiction raises a factual issue

which is not determinable from the face of the record, the burden of proof is on the plaintiff to

present evidence which will establish jurisdiction." Standard Tallow Corporation v. Jowdy, 190

Conn. 48, 53, 459 A.2d 503 (1983).

> 2.   Contacts with Connecticut

For purposes of this case, the Connecticut long-arm statute applicable to nonresident

individual defendants provides, in relevant part, that:

> a court may exercise personal jurisdiction over any nonresident individual, . . . who
> in person or through an agent: (1) Transacts any business within the state; (2)
> commits a tortious act within the state . . .; (3) commits a tortious act outside the state
> causing injury to person or property within the state . . . (A) regularly does or solicits
> business, or engages in any other persistent course of conduct, or derives substantial
> revenue from goods used or consumed or services rendered, in the state, or (B)
> expects or should reasonably expect the act to have consequences in the state and
> derives substantial revenue from interstate or international commerce . . . .

Conn. Gen. Stat. § 52-59b. In order to find personal jurisdiction over a nonresident defendant,

only one of the provisions of Conn. Gen. Stat. § 52-59b(a) needs to be satisfied.  Pro

Performance Corporate Servs., Inc. v. Goldman, 47 Conn. Super. 476, 483, 804 A.2d 248 (2002).

Plaintiff argues that personal jurisdiction over Defendant can be established under three of the

provisions of § 52-59b, namely, that Defendant (1) transacted business in Connecticut; (2)

committed a tort within the State of Connecticut and/or (3) committed a tort outside of

Connecticut that caused injury to Plaintiff in Connecticut.  See Pl's Opp. at 8-20; Compl. ¶ 3.

<div style="margin-left:2em;">

a.    *Whether Defendant Individually Transacted Business in Connecticut for Purposes of Connecticut General Statute § 52-59b(a)(1)*

</div>

The term "transacting business," as used in § 52-59b(a)(1), "is not broadly interpreted in

Connecticut."  Milne, 239 F. Supp. 2d at 198 (quoting Chemical Trading v. Manufacture de

Produits Chimiques de Tournan, 870 F. Supp. 21, 23 (D. Conn. 1994)); accord Mitchell v.

Patterson, No. 4001501, 2005 Conn. Super. LEXIS 1579, at *8, 2005 WL 1671528, at *8 (Conn.

Super. Ct. June 21, 2005).  Several factors are relevant to the consideration of whether an out-of-

state defendant has "transacted business" in Connecticut, including: (1) "whether the defendant

has an on-going contractual relationship with a [Connecticut] corporation;" (2) "whether the

contract was negotiated or executed in [Connecticut] and whether, after executing a contract with

a [Connecticut] business, the defendant visited [Connecticut] for the purpose of meeting with

parties to the contract regarding the relationship;" (3) "what the choice-of-law clause is in any

such contract;" and (4) "whether the contract requires franchisees to send notices and payments

into the forum state or subjects them to supervision by the corporation in the forum state."

Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996).  The

Connecticut Supreme Court construes "transacts any business" to embrace "a single purposeful

business transaction."  Milne, 239 F. Supp. 2d at 202 (quoting Zartolas v. Nisenfeld, 184 Conn.

471, 474, 475, 440 A.2d 179, 181 (1981)).

All factors are relevant, however, no one factor is dispositive; the ultimate determination is based on the totality of the circumstances.  Agency Rent A Car, 98 F.3d at 29; Cutco Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986) ("A court must consider the totality of the circumstances when determining the existence of purposeful activity, and may not subject the defendant to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated' contacts.").  Although "a single purposeful business transaction might be sufficient to confer jurisdiction," courts generally "do not apply a rigid formula but balance considerations of public policy, common sense, and the chronology and geography of the irrelevant factors."  Milne, 239 F. Supp. 2d at 202.  Courts should examine the "nature and quality," rather than the amount of Connecticut contacts to determine whether there was purposeful activity.  Standard Enterprises, Inc. v. Bag-It, Inc., 673 F. Supp. 1216, 1220 (S.D.N.Y.1987). The inquiry focuses on whether the defendant "engaged in some purposeful activity here . . . in connection with the matter in suit." Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 507 (1970) (quotations omitted).

Invoking the fiduciary shield doctrine,[4] Defendant argues that Plaintiff cannot establish personal jurisdiction over him in Connecticut because any contacts he has with the State of Connecticut were purely in a representative capacity as a fiduciary of Nutzz.  See Def's Mem. at

---

[4]   The "fiduciary shield doctrine" is based on the equitable rationale that it would be unjust and inequitable to "force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer."  Noreen Bank v. Miller, 664 F.2d 899, 902 (2d Cir. 1981). This doctrine prevents courts from asserting jurisdiction over nonresident corporate officers "based on [the] transaction of business in Connecticut where the [officer] did not transact any business other than through his corporation."  Milne, 239 F. Supp. 2d at 203.

13-14; Def's Reply at 3.  Numerous Connecticut courts have, in recent decisions, rejected this

doctrine on the grounds that the text and underlying policy of Connecticut's long-arm statute did

not contemplate such a doctrine and that the concerns underlying the doctrine were sufficiently

protected by a due process analysis.  See, e.g., Dictaphone Corp. v. Gagnier, No. 3:05cv266

(CFD), 2006 U.S. Dist. LEXIS 11942, at *6-8 (D. Conn. Mar. 12, 2006); Chase v. Cohen, No.

3:04cv588 (MRK), 2004 U.S. Dist. LEXIS 26408, at *12-14 (D. Conn. Dec. 29, 2004);

Grunberger Jewelers v. Leone, No. 3:03cv647(CFD), 2004 U.S. Dist. LEXIS 11268, 2004 WL

1393608, at *3 (D. Conn. Jun. 18, 2004); Under Par Assocs., L.L.C. v. Wash Depot A., Inc., 47

Conn. Supp. 319, 793 A.2d 300 (2001); see also Kilduff v. Adams, Inc., 219 Conn. 314, 331-32,

593 A.2d 478 (Conn. 1991) ("It is black letter law that an officer of a corporation who commits a

tort is personally liable to the victim regardless of whether the corporation is itself liable.").

Moreover, Connecticut's long-arm statute was modeled after the New York long-arm statute and

although the fiduciary shield doctrine was initially a substantive requirement of New York law,

the New York courts have since rejected the doctrine.  See Kreutter v. McFadden Oil Corp., 71

N.Y.2d 460, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988).  The cases rejecting the doctrine have

stressed that the it unfairly prejudices "plaintiffs who seek relief against defendants conducting

affairs in this State" and that any potential unfairness to the agent acting as fiduciary can be

addressed by the due process requirements that jurisdiction can be sustained only where the

demand for the defendant's presence in the forum state is reasonable and consistent with notions

of "fair play and substantial justice." See Under Par, 793 A.2d at 304 (quoting Kreutter, 71

N.Y.2d at 470-72; International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S.

Ct. 154 (1945)).  As the Court said in Chase v. Cohen, 2004 U.S. Dist. LEXIS 26408 at *14:

14

Whatever validity the "fiduciary shield" doctrine may have in other contexts, it would appear to have no place in this case, which involves allegations that [the individual defendant] violated Connecticut statutes by his own conduct in this state. Any other conclusion would create a situation where employees of out-of-state contractors could come to Connecticut with impunity, violate Connecticut's laws . . . through their conduct in Connecticut, and then escape suit in Connecticut for their actions in Connecticut on the ground that everything they did in Connecticut was done in a "corporate" capacity. There is no reason to believe that is what the Connecticut General Assembly intended when it enacted § 52-59b(a)(1). Any concern that individuals may be unfairly hauled into Connecticut courts can be addressed, as here, through a due process analysis.

Accordingly, the fiduciary shield doctrine is rejected as a bar to jurisdiction.  Under the Connecticut Supreme Court's construction of the term "transacts any business" as embracing "a single purposeful business transaction," Zartolas v. Nisenfeld, 184 Conn. 471, 474, 440 A.2d 179 (Conn. 1981), this Court finds that Defendant has "transacted business" in Connecticut for purposes of § 52-59b.  His two, day-long business trips to Connecticut and numerous phone conversations, e-mails, mail and facsimile transmissions over an extended period of time for the purpose of negotiating, entering into and carrying out an agreement with a Connecticut corporation certainly qualify as "transacting business."  See  Dictaphone Corp. v. Gagnier, No. 3:05cv266 (CFD), 2006 U.S. Dist. LEXIS 11942, at *6-8 (D. Conn. Mar. 12, 2006).

b.      *Tort-Based Jurisdictional Allegations*

Although only one of the provisions of § 52-59b needs to be satisfied for to assert personal jurisdiction over a defendant, Plaintiff also argues that the Court has personal jurisdiction over Defendant under two other provisions of Conn. Gen. Stat. § 52-59b, namely, §§ 52-59b(a)(2) and (3), which permit a court to exercise jurisdiction over "any nonresident individual . . . who . . . (2) commits a tortious act within the state . . . [or] (3) commits a tortious

15

act outside the state causing injury to person or property within the state."  Conn. Gen. Stat. §§ 52-59b(a)(2) & (a)(3).  Plaintiff alleges that Defendant made misrepresentations to Plaintiff both in and outside of Connecticut that induced it to enter into the Agreement and to pay Nutzz.com a $1.25 million advance.  For reasons similar to those discussed above, the fiduciary shield doctrine would also not be a bar to jurisdiction here.  See Kilduff, 219 Conn. at 331-32 (holding that "where . . . an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby").  Accepting Plaintiff's allegations as true for purposes of the jurisdictional analysis, this Court finds that Plaintiff has established jurisdiction over Defendant under §§ 52-59b(a)(2) and (a)(3).

i.      Connecticut General Statute § 52-59b(a)(2)

Plaintiff asserts that jurisdiction over Defendant is proper pursuant to § 52-59b(a)(2) because he physically visited Connecticut on two occasions during which he allegedly made fraudulent misrepresentations to Plaintiff and made telephone calls and other communications to Plaintiff in Connecticut allegedly "designed to further his fraud."  Pl's Opp. at 10.

It is well-established that false or fraudulent misrepresentations transmitted to Connecticut by mail, wire or telephone constitute "tortious conduct in Connecticut sufficient to establish personal jurisdiction under Connecticut's long-arm statute."  David v. Weitzman, 677 F. Supp. 95, 98 (D. Conn. 1987); Cody v. Ward, 954 F. Supp. 43, 44-45 (D. Conn. 1997); Knipple v. Viking Communs., 236 Conn. 602, 610-11, 674 A.2d 426 (1996)[5]; Pro Performance

---

[5]     The Knipple court considered such activities in connection with determining the propriety of establishing jurisdiction under Conn. Gen. Stat. § 33-411(c)(4), the statute which permits courts to assert long-arm jurisdiction over foreign corporations in actions arising "out of tortious conduct in

Corp., Inc. v. Goldman, 47 Conn. Supp. 476, 483-86, 804 A.2d 248 (Conn. Super. Ct. 2002).

Moreover, Connecticut federal district courts have consistently held that it is proper to assert

personal jurisdiction, pursuant to Conn. Gen. Stat. § 52-59b(a)(2), over a nonresident defendant

who transmits fraudulent representations to a Connecticut resident for the purpose of inducing

that resident to act.  See Metropolitan Entertainment Co., Inc. v. Koplik, 20 F. Supp. 2d 354,

358-60 (D. Conn. 1998) (asserting personal jurisdiction over the defendant pursuant to Conn.

Gen. Stat. § 52-59b(a)(2) based on the placement of tortious, including fraudulent, telephone

calls and the sending of fraudulent facsimile transmissions to a Connecticut resident); Cody, 954

F. Supp. at 44-46 (holding that "a nonresident's transmission of fraudulent misrepresentations to

a Connecticut resident by telephone and electronic mail for the purpose of inducing him to buy

and hold securities renders the nonresident subject to suit in Connecticut in an action based on

the misrepresentations" and specifically finding that the defendant's physical presence in the

state was not necessary for the assertion of long-arm jurisdiction pursuant to § 52-59b(a)(2));

David, 677 F. Supp. at 98 (holding that it was proper to assert jurisdiction pursuant to § 52-

59b(a)(2) even when the defendant's "sole contact with the forum state was to send into it by

mail and telephone fraudulent misrepresentations" in connection with the purchase of a

condominium in Florida); AmBase Corp. v. SDG, Inc., No. 3:00cv1694 (DJS), 2002 U.S. Dist.

LEXIS 8817, at *18-20, 2002 WL 1860260 (D. Conn. Mar. 28, 2002) (asserting personal

jurisdiction over the defendant pursuant to § 52-59b(a)(2) based on fraudulent acts committed by

---

this state." Courts interpreting Conn. Gen. Stat. § 52-59b(a)(2), however, have interpreted it in a manner consistent with Conn. Gen. Stat. § 33-411(c)(4).  See David, 677 F. Supp. at 98 (holding that the Connecticut district court had jurisdiction under both Conn. Gen. Stat. § 33-411(c)(4) and Conn. Gen. Stat. § 52-59b(a)(2) and noting that the two provisions are "analogous" and it is therefore not necessary to distinguish between them in the jurisdictional analysis).

a company's individual directors directly or through corporate agents with regard to companies with principal places of business in Connecticut "either through the negotiation . . . or by the activities that surrounded the execution of the contracts").

Far greater contacts exist in this case. Accepting Plaintiff's factual allegations as true, as we must at this stage, Defendant did more than just engage in tortious conduct over the telephone or through the mail; he physically traveled into Connecticut on two occasions and made detailed presentations here in solicitation of a contract with Plaintiff, during which Plaintiff alleges that he made numerous fraudulent representations. See Pl's Opp. at 13 (citing Weiss Decl. ¶¶ 5-14; Compl. ¶¶ 6-8, 47; Meshkin Decl. ¶ 13). Defendant maintained regular communications with Plaintiff in Connecticut up until the Agreement was executed. See Weiss Decl. ¶¶ 5-15. Moreover, following the execution of the Agreement, Plaintiff alleges that Defendant continued to communicate with Plaintiff in Connecticut while failing to disclose that previous representations were inaccurate in order to induce Plaintiff to invest in the venture contemplated by the Agreement. See Compl. ¶¶ 26-28. Accordingly, this Court concludes that Plaintiff's Complaint and the Weiss and Meshkin Declarations establish a prima facie case of tortious conduct in Connecticut sufficient to establish personal jurisdiction over Defendant pursuant to Connecticut's long-arm statute, § 52-59b(a)(2).

     ii.  Connecticut General Statute § 52-59b(a)(3)

Plaintiff also asserts that jurisdiction is proper under Conn. Gen. Stat. § 52-59b(a)(3), which provides that:

> a court may exercise personal jurisdiction over any nonresident individual . . . who . . . (3) commits a tortious act outside the state causing injury to person or property within the state . . . if such person or agent (A) regularly does or solicits business, or

engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

In determining whether personal jurisdiction exists over Defendant pursuant to § 52-59b(a)(3), "the threshold question . . . is whether any injury to the plaintiff occurred in Connecticut." Greene v. Sha-Na-Na, 637 F. Supp. 591, 597 (D. Conn. 1986).  Plaintiff's residence in the state is not enough; "the determinative factor is evidence of direct economic injury to the plaintiff within the state."  Id. (citing Connecticut Aircraft Corp. v. Smith, 574 F. Supp. 626, 629-30 (D. Conn. 1983)); see also Bross Utils. Serv. Corp. v. Aboubshait, 489 F. Supp. 1366 (D.Conn.), aff'd, 646 F.2d 559 (2d Cir.1980) (adopting the "critical events" test applied in Greene).

Plaintiff argues that because its principal place of business is located in Stamford, Connecticut, the economic injury at issue here occurred in Connecticut.  Plaintiff relies, in large part, on AmBase, 2002 U.S. Dist. LEXIS 8817 at *20, which held that the critical events test was satisfied where the defendants' out-of-state fraudulent conduct caused plaintiff to invest with defendants and plaintiff's business and assets were located in Connecticut.  Another Connecticut district court observed, however, in the course of adopting New York's "critical events" test, that:

> Under the New York statute, it has repeatedly been held that the facts that a plaintiff who has lost profits or suffered other pecuniary injury is domiciled or incorporated in that state or that [the forum state] is the plaintiff's principal place of business do not necessarily make [the forum state] the situs of the plaintiff's injury . . . Rather, in the context of commercial torts, the place of injury is generally "the place where the critical events associated with the dispute took place."

Aboubshait, 574 F. Supp. at 1374 (internal citations omitted).

Here, the conversion, theft and other tort-based claims surrounding Plaintiff's claims for

19

repayment of the advance imply that the injury occurred where the funds were located and improperly withheld, i.e., in North Carolina.  However, the alleged fraudulent misrepresentations occurred in Connecticut and in transmissions to Connecticut via telephone and mail.  Moreover, Plaintiff's business and assets, harmed by the loss of the advance, are located in Connecticut. Accordingly, it is found that direct economic injury to Plaintiff occurred in Connecticut.

In order to assert jurisdiction under § 52-59b(a)(3), it must next be determined whether Defendant "(A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . ."  Defendant argues that the May 20, 2004 meeting is insufficient to demonstrate a "persistent course of conduct" in Connecticut, see Def's Reply at 7 (citing Hagar v. Zaidman, 797 F. Supp. 132, 137 (D. Conn. 1992)), and that the fact that the $1.25 million advance was paid to Nutzz pursuant to its own agreement dispels any claim that Defendant individually derived "substantial revenue from interstate commerce."  Id.  Plaintiff argues that Defendant's meetings with Plaintiff in Connecticut to negotiate the Agreement and the consistent contact via telephone calls to Plaintiff in Connecticut and mail sent to Plaintiff in Connecticut after the execution of the Agreement constitute a "persistent course of conduct" in Connecticut.  See Pl's Opp. at 14-15 (citing AmBase, 2002 U.S. Dist. LEXIS 8817 at *21).  Plaintiff contends that since Defendant allegedly controlled the Companies, he expected or should have expected his acts to have consequences in Connecticut.  Id. at 15 (citing AmBase, 2002 U.S. Dist. LEXIS 8817 at *21).  Similarly, Plaintiff argues that the Court should presume that Defendant derived substantial revenue from interstate

commerce through the Companies, as sole principal of the Companies, which took Plaintiff's $1.25 million advance.  Id.

Although it appears that Defendant does not "regularly . . . solicit[] business" or "engage[] in any other persistent course of conduct" in Connecticut, this Court finds that Defendant does satisfy the other prong of the analysis, namely, that he "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  Defendant's acts of soliciting Plaintiff's business in Connecticut, entering into the Agreement with Plaintiff on behalf of his Companies, making misrepresentations to Plaintiff in Connecticut and securing a $1.25 million advance over which, through his Companies, he had access and control, certainly indicate that he reasonably should have expected his acts to have consequences in Connecticut and derived substantial revenue from his commerce there.  Accordingly, it is found that reliance on § 52-59b(a)(3) is appropriate.

   3. <u>Due Process</u>

Since it is found that the Connecticut long-arm statute permits this Court to assert personal jurisdiction over Defendant, the question of whether exercising jurisdiction over him would comport with due process must now be addressed.  The due process analysis consists of two components: whether the defendant has certain "minimum contacts" with the forum state and, if so, whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985); <u>Milne</u>, 239 F. Supp. 2d at 203.  "Either 'specific' jurisdiction or 'general' jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum."  <u>Thomason v. Chemical Bank</u>, 234 Conn. 281, 287-88, 661 A.2d

595 (1995).[6]

Plaintiff alleges no contacts by Defendant with Connecticut other than those giving rise to this cause of action.  Where, as here, the controversy is "specifically" related to Defendant's contacts with the forum, the requisite "minimum contacts" must be such that Defendant can "reasonably anticipate" being haled into court in the forum state—importantly, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253 (1958) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945); see also Burger King, 471 U.S. at 475 (holding that the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person'")) (internal citations omitted).  Accordingly, with respect to the minimum contacts requirement, the Supreme Court has said that:

> where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Burger King, 471 U.S. at 475-76 (internal quotations omitted); see also McGee v. Int'l Life Ins. Co., 355 U.S. at 223 (holding that even a single act, if it creates a "substantial connection" with

---

[6]   "Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction—minimum contacts exist where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." Bank Brussels Lambert, 305 F.3d at 127 (quotation marks omitted, citations omitted). General jurisdiction, i.e., "jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts," can be asserted only where defendant's contacts are "continuous and systematic." Id.

the forum, can support jurisdiction).  The minimum contacts inquiry rests upon the totality of the

circumstances, such that all of Defendant's contacts with the forum state must indicate that

jurisdiction is proper. Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir.

2005). Defendant's contacts with Connecticut—namely, his acts of seeking out Plaintiff as a

potential business partner, making two trips to Connecticut for the purpose of inducing Plaintiff

to enter into an agreement with his Companies and maintaining regular communications with

Plaintiff in Connecticut up to and after the execution of the Agreement—"proximately result

from actions by the defendant himself that create substantial connection with the forum such that

he should reasonably anticipate being haled into court there."  Cody, 954 F. Supp. at 46-47.

The second part of the jurisdictional analysis asks whether the assertion of personal

jurisdiction comports with "traditional notions of fair play and substantial justice"—i.e., whether

the assertion of jurisdiction is reasonable under the circumstances of the particular case.  "Courts

are to consider five factors in evaluating reasonableness: (1) the burden that the exercise of

jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the

case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the

shared interest of the states in furthering substantive social policies." Bank Brussels Lambert,

305 F.3d at 129 (citations omitted, quotation marks omitted).

In this case, accepting Plaintiff's factual allegations as true, this Court finds that

Defendant purposefully availed himself of the benefits of this state by seeking out a Connecticut

company to do business with and making fraudulent representations in an effort to induce it to

enter into an agreement with his Companies and to give Nutzz a $1.25 million advance.  "The

commission of the intentional tort of fraudulent misrepresentation has the foreseeable

consequence of direct economic injury to [P]laintiff at [its place of business] in Connecticut."

David, 677 F. Supp. at 100.  As such, Connecticut has an interest in providing Plaintiff with a

forum for its suit and thus protecting its citizens.  Moreover, because the relative conveniences of

litigating in Connecticut and North Carolina "reduce essentially to the balance between the

interests of the parties themselves in litigating in their respective home states," "[i]t would not, in

these circumstances, offend the due process clause to subject [D]efendant[] to suit in this

district."  Id.  Accordingly, the assertion of jurisdiction over Defendant in Connecticut pursuant

to §§ 52-59b(a)(1), (a)(2) and (a)(3) would not offend constitutional principles of due process.

### B.    Plaintiff's Fraud Claims

In the Complaint, Plaintiff makes a claim of fraud and fraud in the inducement, alleging

that Defendant "engaged in a scheme to defraud [Plaintiff] by [knowingly] misrepresenting and

concealing Nutzz.com's and Bang Racing's marketing inabilities," their "lack of staff and

operational support," Defendant's and his companies' "dire financial situation," and "the loss of

key members of the Bang Racing team" in an effort to induce Plaintiff to enter into the

Agreement and to continue investing in the program, resulting in "significant damages." Compl.

¶¶ 46-50.  Defendant contends that the representations complained of were not representations of

fact, but were "aspirational representations" that Plaintiff contractually agreed it was not relying

on when it executed the Agreement.  Def's Mem. at 16 (citing Compl. ¶ 26(a)-(c)). Defendant

also argues that the representations at issue were "temporally distinct from the execution of the

Agreement" and "Nutzz was under no duty to disclose the facts that were allegedly 'withheld.'"

Id. (citing Compl. ¶ 26(d)-(g)).

1.      Standard Applicable to a Rule 12(b)(6) Challenge

The function of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 776 (2d Cir. 1984) (citation omitted). Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Courts should not grant a Rule 12(b)(6) motion to dismiss merely because recovery seems unlikely or remote, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (following the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

When ruling on a motion to dismiss, a district court should decide the motion on the complaint alone, excluding additional evidence, affidavits, exhibits and factual allegations contained in legal briefs or memoranda. Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). Appellate courts may properly vacate a district court's ruling on a motion to dismiss "even where the court's ruling simply makes a connection not established by the complaint alone or contains an unexplained reference that raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion." Id. at 84 (internal citations omitted).

2.      Fraudulent Misrepresentation Claim

25

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."  Restatement (Second) of Torts § 525.  A claim for fraudulent misrepresentation requires that a plaintiff prove: (1) that the defendant made a fraudulent misrepresentation of or concealed a material fact; (2) that the statement (or omission) was false and was known by the defendant to be false or was made with a reckless indifference to its truth; (3) that the statement (or omission) was made in order to induce the plaintiff to act in reliance on it; (4) that the plaintiff did so act, with justifiable or reasonable reliance on the representation and (5) that the plaintiff was a injured as a result of the reliance.  See Updike, Kelly & Spellacy, P.C. v. Beckett, 850 A.2d 145 (Conn. 2004); Citino v. Redevelopment Agency, 51 Conn. App. 262, 275, 721 A.2d 1197 (1998).

Defendant first argues that Plaintiff's claims of fraudulent misrepresentation fail as a matter of law because Plaintiff contractually agreed only to rely on those representations, warranties and covenants outlined in the Agreement.  See Agreement ¶ 4, Compl. at Exh. A. Specifically, the Agreement provides that:

Nutzz hereby represents, warrants and covenants to [Vertrue]:

a.   Nutzz Organization. Nutzz is duly authorized, qualified or licensed and in good standing in all jurisdictions necessary to carry out its obligations under this Agreement.

b.   No Breach. The execution, delivery and performance of its obligations under this Agreement by Nutzz will not result in a violation of, or conflict with any law, rule, regulation or agreement or contract to which Nutzz is a party or is bound.

c.   Compliance with Laws. Nutzz shall perform its obligations hereunder at all times in accordance with all applicable federal, state and local laws, rules and

26

regulations.

d.   <u>Performance</u>. Nutzz will perform all of its obligations under this Agreement including but not limited to those listed in Section 3 hereof.

e.   <u>Additional</u>. Nutzz has the right to grant any and all rights specified hereunder with respect to Nutzz intellectual property and Customer Information.

f.   <u>Misleading Materials</u>. For Nutzz Distribution Channels hereunder, Nutzz shall use only such materials marketing, promoting or otherwise referencing the Club that have been approved by the Parties in advance in writing.

Agreement ¶ 4, Compl. at Exh. A.  The Agreement also contains a standard integration clause, providing that "[t]his Agreement constitutes the entire agreement between [Vertrue] and Nutzz with respect to the subject matter hereof and may only be amended in a written document signed by Nutzz and [Vertrue]."  <u>Id</u>. ¶ 14.

In support of its contention that Plaintiff cannot rely on representations not contained in the Agreement, Defendant relies on the Delaware Chancery Court's rule that "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract."  <u>H-M Wexford LLC v. Encorp, Inc.</u>, 832 A.2d 129, 142 n.18 (Del. Ch. 2003) (citing <u>Great Lakes Chemical Corp. v. Pharmacia Corp.</u>, 788 A.2d 544, 555-56 (Del. Ch. 2001)).  The Delaware Chancery Court has more recently limited this rule, providing that:

> for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims. Rather, in that circumstance, the defendant will remain at risk if the plaintiff can meet the difficult burden of demonstrating fraud.

<u>Kronenberg v. Katz</u>, 872 A.2d 568, 593 (Del. Ch. 2004).  Moreover, the only Connecticut case

cited by Defendant in support of his argument is <u>McCann Real Equities Series XXII, LLC v.</u>

<u>David McDermott Chevrolet, Inc.</u>, 93 Conn. App. 486, 512-15, 90 A.2d 140 (Conn. App. 2006).

In holding that the plaintiffs could not justifiably rely on the alleged fraudulent

misrepresentations, the <u>McCann</u> court relied, in part, on the fact that the plaintiffs had

"contracted away their right to rely on any representation by the defendants" by agreeing, at the

time of entering into the agreement, "that they would rely on their own investigation of the

premises and not on any representation made by the defendants." <u>McCann Real Equities Series</u>

<u>WWII, LLC</u>, 93 Conn. App. at 514. The fact that the plaintiffs had contracted away their right to

rely on the defendants' representations was treated only as evidence supporting the defendants'

position; the court did not hold that the plaintiffs claim was barred, as a matter of law, by the

contractual provisions. <u>See</u> <u>id</u>. at 512-15.

The Agreement in this case does not contain "language that, when read together, can be

said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised

that it did not rely upon statements outside the contract's four corners in deciding to sign the

contract." <u>Kronenberg</u>, 872 A.2d at 593. Like the <u>Kronenberg</u> court held, the standard

integration clause present in this Agreement, "which does not contain explicit anti-reliance

representations and which is not accompanied by other contractual provisions demonstrating with

clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not

suffice to bar fraud claims." <u>Id</u>. Although Defendant may use the representations and warranties

contained in the Agreement as *evidence* in support of its argument that Plaintiff's reliance was

not reasonable or justifiable, the representations and warranties do not, as a matter of law, bar

Plaintiff's fraudulent misrepresentation claim.

<div align="center">28</div>

3.      Defendant's Pre-Agreement Representations

a.      *Representations as to Being a Successful Entrepreneur*

Plaintiff alleges that Defendant represented to Doug Weiss that he was a "successful entrepreneur" who had previously built and sold an Internet-based company for "millions of dollars."  Compl. ¶ 26(a).  Defendant contends, assuming *arguendo* that the representation was false, that Plaintiff's reliance on the representation was neither reasonable nor justifiable since the Companies are Delaware limited liability companies which Defendant, as President and manager, was under no legal obligation to fund.  Def's Mem. at 17 (citing 6 Del. C. § 18-303(a)).  Moreover, Defendant contends that Plaintiff's reliance is suspect as it did not require Defendant to personally guarantee the Companies' obligations under the Agreement or provide financials.  Id.

Although Defendant may indeed be correct, the issue of whether Plaintiff's reliance on the representations were reasonable is a question of fact not properly decided on a motion to dismiss.  See Mips v. Becon, Inc., 70 Conn. App. 556, 558, 799 A.2d 1093 (2002) ("Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact.") (quoting Citino v. Redevelopment Agency, 51 Conn. App. 262, 273-74, 721 A.2d 1197 (1998); Jaser v. Fischer, 65 Conn. App. 349, 358, 783 A.2d 28 (2001) ("Allegations such as misrepresentation and fraud present issues of fact. . . . Moreover, whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact.").  Therefore, the question of whether Plaintiff reasonably or justifiably relied on the representations is a question of fact not properly decided at this stage in the litigation.

b.      *Failure to Disclose regarding Larry McReynolds*

According to the Complaint, during the parties' May 20, 2004 meeting, Defendant represented that Bang Racing had an agreement with Larry McReynolds, "a well-known figure in NASCAR® and a Fox Television announcer that would provide credibility for Nutzz Elite within the NASCAR® circuit and significant, high-profile promotional opportunities." Compl. ¶ 26(b).  Plaintiff says that in his presentation, Defendant "touted the benefits of the Companies' association with McReynolds" and knew that his association with the Companies was "material" to Plaintiff's decision to enter into the Agreement. Pl's Opp. at 28.  McReynolds subsequently had a "falling out" with Defendant and ceased his affiliation with Bang Racing.  Plaintiff alleges that Defendant failed to disclose this fact and that Defendant's failure to disclose constitutes an actionable misrepresentation.  Compl. ¶ 26.

Defendant, however, contends that the information *was* disclosed, albeit via a press release issued by Bang Racing on July 11, 2004—four days before the parties signed the Agreement—and posted on the NASCAR.COM® website.  See Def's Mem. at 18; see also http://www.nascar.com/2004/news/headlines/truck/07/11/lmcreynolds_bang/index.html.  According to Defendant, because information about McReynolds' disassociation with Bang Racing was "in the public domain and readily accessible," Plaintiff cannot now claim that its reliance on statements made by Defendant nearly two months prior to the signing of the Agreement was reasonable or justifiable.  Def's Mem. at 18.  As stated above, however, the issue of whether Plaintiff reasonably and justifiably relied on Defendant's representations and alleged failure to disclose in light of the press release is an issue of fact not properly decided on a motion to dismiss.  See Mips, 70 Conn. App. at 558; Jaser, 65 Conn. App. at 358.  The bare allegations in the Complaint, taken as true, state an actionable claim for fraud.  Accordingly, the Court declines

to dismiss the claim at this time.

              c.     *Representations regarding Nutzz's Internet Development and Marketing Services*

       Plaintiff also alleges that Defendant represented, at the May 20, 2004 meeting, that Nutzz had a "significant Network Operations Center in Herndon, Virginia, as well as two off-shore software development centers capable of providing significant Internet development and marketing services." Compl. ¶ 26(c). Defendant, in its Memorandum, argues that this statement could not have been material based on the fact that after certain deadlines went unmet, Plaintiff waited three-and-a-half months to demand repayment of the $1.25 million. See Def's Mem. at 19. Defendant essentially argues that if Plaintiff did not regard the delay as critical enough to warrant immediate action, the reason for the delay, i.e., the alleged lack of Nutzz employees, could not have been a material fact that would have prevented it from entering into the Agreement. Id.

       As with the questions of whether Plaintiff's reliance was reasonable, the materiality of a misrepresentation is also a question of fact not properly decided on a motion to dismiss. See Mips, 70 Conn. App. at 558; Jaser, 65 Conn. App. at 358; see also Feiner v. SS&C Techs., Inc., 11 F. Supp. 2d 204, 207-08 (D. Conn. 1998) ("[T]he materiality of a statement is usually a question for the fact finder. . . . Thus, although not impossible, it is unlikely that a cause of action which requires a determination of materiality can be dismissed as a matter of law.") (citing, among others, TSC Indus. v. Northway, Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)); Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985) ("Materiality is a mixed question of law and fact and a complaint may not properly be dismissed pursuant to Rule

12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (internal citation omitted)).  Given the high standard for dismissing a complaint on the basis that statements are not material and courts' general practice of treating materiality as a question of fact, Defendant's tenuous argument that the representations were not material does not provide a sufficient basis to dispose of the claim at this stage.  Accordingly, this Court will deny Defendant's Motion to Dismiss Plaintiff's claims as they relate to Defendant's misrepresentations about the Companies' marketing and development capabilities.

### 4.    Defendant's Post-Agreement Representations

The remaining misrepresentations cited by Plaintiff all concern information regarding events occurring in January 2005 that Defendant allegedly failed to disclose, specifically the loss of Bang Racing's driver, Travis Kvapil, the loss of the Line-X sponsorship of Bang Racing for the 2005 racing season, the fact that Bang Racing was "essentially disolved" and that Nutzz and Bang Racing were "essentially evicted" from their offices, and the transfer of all of Bang Racing's assets, including the entire stock of Bang Racing's vehicles, fuel cells and equipment, as part of a January 25, 2005 Settlement Agreement with Spencer and SMV, leaving Nutzz and Bang Racing without the assets through which they were to perform their trackside marketing obligations for the Nutzz Elite program.  See Compl. ¶ 26(d)-(g).  Plaintiff also alleges that Defendant continued, after January 2005, to falsely hold out Kvapil as the driver and Line-X as the sponsor on the race team's website.  Compl. ¶ 26(d) & (e).

Defendant asserts that Plaintiff's allegations do not state an actionable claim, arguing that

because the only concrete "injury" Plaintiff alleges is the loss of the $1.25 million advance, the alleged "omissions" of facts approximately six months after the parties executed the Agreement and Plaintiff paid the advance cannot give rise to a claim for fraud.  See Def's Mem. at 20.

Plaintiff, however, contends that Defendant's ongoing failure to disclosure material information caused Plaintiff to incur additional losses and was done in an effort to induce Plaintiff to continue to invest in a program that the Companies were incapable of supporting. See Pl's Opp. at 30-31 (citing Compl. ¶ 47).  Plaintiff contends that in addition to the initial $1.25 million monetary advance, the Agreement obligated it to "develop . . . benefit fulfillment materials associated with becoming a Member," Agreement ¶ 3(d)(i), Complaint at Exhibit A, and to provide other development and marketing services which required Plaintiff to invest personnel and other resources.  Id. ¶ 3(a), Exh. B.  Moreover, according to Plaintiff, Defendant's failure to disclosure the alleged material information caused Plaintiff to delay terminating the Agreement and initiating attempts to recoup its $1.25 million advance, thus potentially diminishing or preventing altogether Plaintiff's opportunity to recoup its investment.  Pl's Opp. at 31.  As it appears that there is an issue of fact with regard to these claims, Plaintiff's claims regarding the alleged post-agreement fraudulent misrepresentations will not be dismissed.

C.    **Plaintiff's Statutory and Common Law Tort Claims**

In its Complaint, Plaintiff asserts tort claims of civil theft, conversion and unjust enrichment, alleging that Defendant, through his misrepresentations and intentional failures to disclose, (1) "deprived Vertrue of the $1.25 million Advance it made to Nutzz.com, a company Meshkin controlled for his own benefit," Complaint ¶ 52, (2) "induced Vertrue to pay Nutzz.com the $1.25 million Advance," "assumed and exercised the rights of ownership and control over

33

[the] Advance," and "refused to repay Vertrue the . . . Advance," Complaint ¶¶ 56-58, and (3) "induced Vertrue to enter into the Agreement and deprived Vertrue of its $1.25 million Advance it made to Nutzz.com," "Meshkin received a benefit from Vertrue and the parties intended and expected that Meshkin, or the companies he controls, would pay Vertrue for bestowing that benefit," and that as a result of the nonpayment, Plaintiff has "unjustly" suffered damages, Complaint ¶¶ 60-62.  Defendant argues that these claims must be dismissed as Plaintiff "fails to allege that Meshkin actually possesses the funds advanced pursuant to the terms of the Agreement and even if he is presumed to possess the funds, the facts alleged in the Complaint disclose nothing more than a commercial debt recoverable pursuant to mandatory arbitration." Def's Mem. at 21.  Defendant further claims that since Vertrue repeatedly states that the funds were voluntarily transferred to Nutzz pursuant to the Agreement and because Meshkin, as President and manager of Nutzz, has a legal and fiduciary obligation to use and protect those funds for the benefit of the company, Plaintiff's tort claims to recover the advance are factually flawed.  Id. (citing Compl. ¶¶ 1, 14, 23, 28 and 36).  Defendant maintains that Plaintiff "cannot transform a contested commercial debt dispute that is proceeding in accordance with the parties' mandatory arbitration obligations into claims for civil theft, conversion and unjust enrichment by asserting baseless allegations that Meshkin . . . is refusing to return the advance."  Id. at 21-22.

Plaintiff, on the other hand, argues that the claims are not "repackaged" commercial debt claims but are claims seeking damages *personally* against Defendant for torts he participated in while an officer of the Companies, citing the rule that "[w]here . . . an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." Scribner v. O'Brien, Inc., 363 A.2d

34

160, 168 (Conn. 1975); accord BEC Corp. v. Department of Environmental Protection, 256 Conn. 602, 619, 775 A.2d 928 (2001). "To impose personal liability against an officer of a corporation, courts do not require that an officer benefit personally from the conversion, and have held corporate officers who participated in the commission of the tort of conversion liable for such acts, even if the participation is for the corporation's benefit." Mystic Color Lab v. Auctions Worldwide, L.L.C., No. 568369, 2005 Conn. Super. LEXIS 1095, at *5-6 (Conn. Super. Ct. Apr. 19, 2005) (citing Key Bank of New York v. Grossi, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403 (N.Y. App. Div. 1996); Edwards v. Horsemen's Sales Company, Inc., 148 Misc. 2d 212, 214, 560 N.Y.S. 2d 165 (N.Y. App. Div. 1989)).  Similarly, in this case, it is not necessary for Plaintiff to show that Defendant personally benefitted from the alleged torts, only that he participated in the commission of them.  Moreover, Plaintiff alleges and can potentially recover damages beyond the $1.25 million advance paid to Nutzz.  Accordingly, Plaintiff's tort claims will not be dismissed at this time.

### D.    Necessary and Indispensable Parties

Federal Rule of Civil Procedure 19 dictates when potential parties to an action must be joined and what recourse remains if such "necessary and indispensable" parties are unable to be joined.  The rule involves a two-step determination.  First, courts must determine whether a potential party is "necessary," i.e. when:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).  If a party deemed necessary under Rule 19(a) cannot be joined, the court

must determine "whether in equity and good conscience the action should proceed among the

parties before it, or should be dismissed, the absent person being thus regarded as indispensable."

Fed. R. Civ. P. 19(b).  Courts are to consider four factors in determining whether a party is

"indispensable":

> first, to what extent a judgment rendered in the person's absence might be prejudicial
> to the person or those already parties; second, the extent to which, by protective
> provisions in the judgment, by the shaping of relief, or other measures, the prejudice
> can be lessened or avoided; third, whether a judgment rendered in the person's
> absence will be adequate; fourth, whether the plaintiff will have an adequate remedy
> if the action is dismissed for nonjoinder.

Id.

In determining whether Nutzz and Bang Racing are necessary and indispensable parties,

the Court must first determine whether Delaware or Connecticut law applies.  In issues of

corporate governance, Connecticut courts apply the Restatement (Second) of Conflict of Laws'

"most significant relationship" test to determine which law to apply:

> The local law of the state of incorporation will be applied to determine the right of
> a shareholder to participate in the administration of the affairs of the corporation, in
> the division of profits and in the distribution of assets on dissolution and his rights
> on the issuance of new shares, except in the unusual case where, with respect to the
> particular issue, some other state has a more significant relationship . . . .

Restatement (Second) of Conflict of Laws § 303; see NatTel, LLC v. SAC Capital Advisors, No.

3:04cv1061 (JBA), 2005 U.S. Dist. LEXIS 20179, at *25, 2005 WL 2253756 (D. Conn. Sept. 16,

2005).  This "internal affairs doctrine" provides that "the law of the state of incorporation

normally determines issues relating to the internal affairs of a corporation" because "application

of that body of law achieves the need for certainty and predictability of result while generally

protecting the justified expectations of parties with interests in the corporation." First Nat. City

Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621, 77 L. Ed. 2d 46, 103 S.

Ct. 2591 (1983).

"Different conflicts principles apply, however, where the rights of *third parties external*

to the corporation are at issue." Id. (emphasis added). Thus, for example, the making of contracts,

the commission of torts and the transfer of property between the corporation and third parties

may be governed by the local law of different states. Restatement (Second) of Conflict of Laws §

302 cmt. e.  As the court in McDermott, Inc. v. Lewis, 531 A.2d 206, 214-15 (Del. 1987),

explained:

> *Corporations and individuals alike enter into contracts, commit torts, and deal in
> personal and real property.* Choice of law decisions relating to such corporate
> activities are usually determined after consideration of the facts of each transaction.
> In such cases, the choice of law determination often turns on whether the corporation
> had sufficient contacts with the forum state, in relation to the act or transaction in
> question, to satisfy the constitutional requirements of due process. The *internal
> affairs doctrine has no applicability in these situations*. Rather, *this doctrine governs
> the choice of law determinations involving matters peculiar to corporations*, that is,
> *those activities concerning the relationships inter se of the corporation, its directors,
> officers and shareholders.*

Id. (emphasis added) (internal citations omitted).  This case, rather than involving the

relationships "inter se" of the Corporations, primarily involves an external third party's tort

claims against Defendant as an individual.  Accordingly, the internal affairs doctrine would not

apply and the court should apply the law of the state which, with respect to the tort(s) at issue

here, "has the most significant relationship to the occurrence and the parties."  Restatement

(Second) of Conflict of Laws § 145.  In determining which state's law applies, the court should

consider:

(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Id. This Court has already determined that the injury and the conduct causing the injury—i.e., Defendant's alleged fraudulent statements—took place in Connecticut. The third factor, the domicil, residence, nationality, place of incorporation and place of business of the parties, reduces essentially to the balance of interests of the two parties, as Vertrue's primary place of business is in Connecticut and Meshkin resides in North Carolina. The fourth factor is also not determinative, however, since Defendant traveled twice to Connecticut to discuss the parties' joint venture, it would not be unfair to apply Connecticut law.

Defendant argues that the Companies are necessary parties because Plaintiff is seeking "an adjudication of certain rights arising under the Agreement by and between itself, Nutzz and Bang Racing." Def's Mem. at 23. Although the Companies should be joined if their rights and interests were at issue here, it is not clear that such is the case. Plaintiff claims, in this action, that Defendant is jointly and severally liable for repayment of the $1.25 million advance. As discussed previously, Defendant can be held liable in his individual capacity for any torts that he committed. See Scribner v. O'Brien, Inc., 363 A.2d 160, 168 (Conn. 1975) ("Where . . . an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby."). According to the long-standing rule that "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit," the Companies need not be joined here if their own liability is not at issue. Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7 (1990); see also Winchester Elec. Corp. v. General

Products Corp., 198 F. Supp. 355, 358 (D. Conn. 1961) ("There is no law which requires an aggrieved party to sue all tort-feasors in a particular cause of action.").

Moreover, although Defendant argues that the Companies are necessary parties based on Plaintiff's requested relief of piercing the corporate veil of these entities and assigning liability under an alter ego theory of liability, at least one court in Connecticut has held that "[t]he inclusion of a corporation as a defendant is not a necessary element in an action based on piercing the corporate veil." Andrews v. Caron Bros., No. 45136, 1992 Conn. Super. LEXIS 870, at *19, 1992 WL 67396 (Conn. Super. Ct. Mar. 26, 1992).[7]

Upon consideration of Rule 19(a), the Court finds that the Companies are not necessary parties. Specifically, it has not been shown that: (1) in the Companies' absence complete relief cannot be accorded among Plaintiff and Defendant; or (2) the Companies claim an interest relating to the subject of the action and are so situated that adjudicating the action in their absence may (i) as a practical matter impair or impede the Companies' ability to protect their interests or (ii) leave Defendant with a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. Fed. R. Civ. P. 19(a). Accordingly,

---

[7] The cases cited in Defendant's Memorandum, in addition to being inapplicable because they are based upon Delaware law, do not support Defendant's claim that the Companies are necessary and indispensable parties to this litigation. La Chemise Lacoste v. General Mills, Inc., 487 F.2d 312, 314 (3d Cir. 1973), held only that three companies added by the plaintiff were not subject to compulsory joinder under Rule 19(a) even though they were corporate relatives of the defendant, and accordingly, has no bearing on this case. Moreover, in Japan Petroleum (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F. Supp. 831, 847-48 (D. Del. 1978), in determining whether the case should be dismissed under Rule 19 for failure to join a subsidiary of the defendants, the court found, after the parties conducted discovery and submitted evidence, that the defendants could not be held liable as principals of the missing party/agent. Accordingly, the court held that the missing party was indispensable because the plaintiff would not be able to obtain relief from the existing defendants, which, in the absence of an established agency relationship, could not be held liable for the missing party's breach of contract. In this case, however, Plaintiff has alleged facts that, if proven, will establish Defendant's personal liability and will allow it to obtain relief.

39

the action will not be dismissed pursuant to Rule 19 and can proceed without Nutzz and Bang Racing.

    **E.**    **Defendant's Motion to Stay**

As explained in Section II, supra, the Agreement between Plaintiff and the Companies contains a mandatory arbitration provision, pursuant to which Plaintiff and the Companies are currently engaged in ongoing arbitration scheduled to close July 6, 2006.  Defendant argues that this action should be stayed or dismissed in favor of the ongoing arbitration efforts, which, according to Defendant, will resolve many of the factual issues presented in this action.  See Def's Mem. at 25-29.  Defendant asserts that given the parties' intent to arbitrate its dispute and the fact that the arbitration will resolve around the same controversy and involve the same witnesses, this Court should exercise its discretion to stay the action pending resolution of the arbitration.  See Def's Mem. at 27-28.

This Court recognizes Connecticut's "strong public policy in favor of arbitration," Lupone v. Lupone, 848 A.2d 539, 542 n.5 (Conn. App. 2004), see also Doctor's Associates, Inc. v. Distajo, 107 F.3d 126, 130 (2d Cir. 1997) (recognizing the similar federal policy), however, this action will not be stayed in favor of the ongoing arbitration proceeding.  The causes of actions Plaintiff asserts in the Arbitration Counterclaim do not—and cannot—establish the personal liability of Defendant for his personal torts against Plaintiff because he is not a signatory to the Agreement and is not a party to the arbitration.  Pl's Opp. at 7.  Moreover, Plaintiff has not asserted claims against the Companies in the arbitration for conversion, statutory theft or unjust enrichment.  Id.  Therefore, in the present action, Plaintiff does not seek the same remedy as in the arbitration; here Plaintiff seeks damages and other relief against Defendant personally for his

participation in the alleged tortious conduct and seeks to pierce the corporate veil and hold Defendant personally liable for breach of contract as a result of his relationship with the Companies. See Boguslavsky v. Kaplan, 159 F.3d 715, 720-21 (2d Cir. 1998) (reversing the district court's entry of summary judgment because claims asserted in that case seeking to establish "controlling person" liability—joint and several with the liability of the controlled persons—are separate and distinct from the claims asserted in the arbitration against the controlled persons).

Additionally, the liability of Defendant and the Companies as to the $1.25 million advance is joint and several and, in such a case, there is no requirement that Plaintiff seek relief from all potentially liable parties. See Temple, 498 U.S. at 7 ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); Winchester Elec. Corp., 198 F. Supp. at 358 ("There is no law which requires an aggrieved party to sue all tort-feasors in a particular cause of action."); see also Semple v. Morganstern, 97 Conn. 402, 404-05, 116 A. 906 (1922) ("Under this generally accepted rule [that "[a]ll who actively participate . . . in the commission of a tort . . . are jointly and severally liable therefor], both principal and agent, who is himself a participant in the conversion, are liable in trover.").

Finally, since Defendant is not bound by the decision in the arbitration proceeding, there is no value to be served by staying the litigation. Although the two proceedings may involve the same facts, Plaintiff cannot get an adjudication against Defendant in the arbitration. This Court sees no reason to delay Plaintiff's efforts to bring the action against Defendant to fruition. Accordingly, this action will not be stayed.

## III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss or Stay [Doc. Nos. 39, 43] is

**denied**.

SO ORDERED.

Dated at New Haven, Connecticut, April  26 , 2006.

/s/
_____
Peter C. Dorsey, U.S. District Judge
United States District Court